UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN M.,[1]

                          Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.

_____

DECISION and ORDER

6:21-CV-06304 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits.   Now before the Court is Plaintiff's motion (ECF No. 8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 9) for the same relief.   For the reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or

---

[2]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3]  "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further,
Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social
security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's
conclusions "are supported by substantial evidence in the record as a whole or are based
on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see
also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the
decision if it is supported by substantial evidence and the correct legal standards were
applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v.
Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the
Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d
Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error
of law has been made that might have affected the disposition of the case, this court
cannot fulfill its statutory and constitutional duty to review the decision of the
administrative agency by simply deferring to the factual findings of the [administrative law
judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.")
(citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines
the record to determine if the Commissioner's conclusions are supported by substantial
evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more
than a mere scintilla.   It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.   The Court will refer to the record only

as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff claims to be disabled from working due to a combination of physical and mental impairments.    Primarily, Plaintiff claims to be unable to sit or stand for more than five minutes at a time, due to pain in his hip.    In that regard, following a motor vehicle accident in 2016, Plaintiff's right hip was surgically replaced (hip arthroplasty) multiple times, and he experienced numerous dislocations of the prosthetic hip joint.    Plaintiff claims that his hip has dislocated thirteen times and that he experiences anxiety and panic attacks relating to the possibly that his hip could again dislocate at any time.    Plaintiff attributes the repeated dislocations to the fact that, after his first prosthetic hip joint failed, the surgeon who performed his second hip replacement used an incorrectly-angled prosthesis, making the joint prone to dislocate. (Tr. 59-60).[4] Plaintiff was scheduled to have further surgery to correct that problem, to take place after the administrative hearing. Plaintiff also has a longstanding and continuing pattern of addiction and substance abuse involving alcohol, cocaine, heroin, and prescription opioids.

Plaintiff has a GED diploma and has worked as a concrete mason and sign-language interpreter.    Plaintiff claimed that he last worked as an online interpreter in 2017, and that he stopped working due to hip pain.    On April 11, 2018, Plaintiff filed an application for SSDI benefits which initially indicated disability as of July 15, 2016. However, Plaintiff worked after that date, and was also incarcerated in state prison for a time, apparently for violating parole,[5] and later asked to amend the disability onset date

---

[4] Plaintiff testified at the hearing that he was scheduled to have surgery on October 5, 2020, to correct this problem. (Tr. 59).

[5] The Court takes judicial notice of the date information pertaining to Plaintiff's most-recent incarceration

to May 1, 2017.

On June 22, 2020, after Plaintiff's claim was denied initially, an ALJ conducted a hearing, at which Plaintiff appeared with a non-attorney representative.[6]   The ALJ took testimony from Plaintiff and a vocational expert ("VE").   Plaintiff testified that he essentially performs no household chores, does not drive a car, and spends his days lying on his sofa watching television.   Plaintiff indicated that he can only stand or sit for five minutes at a time, that he can walk fifty feet with a severe limp, and that he can only lift and carry about ten pounds.   Plaintiff further maintained that he needs a cane to walk. Plaintiff testified that he lives in a split-level home with his parents, and that he is able to navigate the two sets of stairs that divide the house.   Plaintiff indicated that he is unable to raise his left shoulder due to an injury, and that he also has lower back pain.   Plaintiff indicated that he has anxiety concerning his hip, and that he experiences panic attacks once per day.   Plaintiff indicated that he stopped working as an interpreter in 2017 due to hip pain.   Plaintiff testified that he had not used any illegal drugs since 2016. (Tr. 67).

On September 30, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the original alleged disability onset date, July 15, 2016,[7] and the date of the decision.   The ALJ applied the five-step sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of the following: "[S]tatus post fractured right hip and multiple surgeries, including open reduction internal

---

found on website of the New York State Department of Corrections and Community Supervision.
[6] The hearing was conduced by telephone due to the Covid-19 lockdown.
[7] The ALJ noted that Plaintiff engaged in substantial gainful activity after that date, but nevertheless used the earlier date rather than Plaintiff's later proposed amended date.

fixation acetabulum, subsequent total hip arthroplasty, revision arthroplasty, posttraumatic hip arthritis, and multiple dislocations requiring replacement in hospital setting; hepatitis C; degenerative changes in the lumbar and cervical spine; anxiety disorder; depressive disorder; and polysubstance abuse disorders." The ALJ found that Plaintiff's shoulder condition was not a severe impairment.

The ALJ further found that Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment. In that regard, the ALJ stated:

> The claimant's lumbar and cervical spine impairments have been considered under listing 1.04, though he has no evidence of cord or nerve root compromise, pseudoclaudication, spinal arachnoiditis, or inability to ambulate effectively as defined in 1.00B2b. During rehabilitating periods post-surgery, the claimant was given ambulatory aids on a short-term basis but there is no evidence to indicate they were prescribed longitudinally. The claimant frequently presented with a limping gait, though this is substantially related to his repeated noncompliance adhering to post-operative non-weight bearing restrictions and warnings against sitting at a 90-degree angle during recovery. Even with such limping gait, the claimant did not display longitudinally consistent imbalance or substantial loss of motor function or reflex. Listings 1.02, 1.03, and 1.06 have been considered similarly regarding 1.00B2b.

(Tr. 22).

The ALJ next found that, despite Plaintiff's impairments, he retained the RFC to perform less than a full range of sedentary work:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can only occasionally stoop, crouch, and climb ramps and stairs; cannot kneel, crawl, work at unprotected heights, or climb ladders, ropes, or scaffolds; should avoid the use of heavy machinery as well as motor vehicles for work purposes; requires the ability to alternate between sitting and standing at-will but must remain on-task during the sit/stand period; and is limited to low stress

occupations defined as having simple routine tasks, basic work-related decisions, and rare changes in workplace setting.

(Tr. 24).

In making this RFC finding, the ALJ found that Plaintiff's statements about his symptoms were not entirely consistent with the record overall.   For example, the ALJ noted that the treatment records did not support Plaintiff's claims concerning anxiety, panic attacks, back pain, or shoulder restriction. The ALJ stated that the record showed little treatment for any physical condition except for Plaintiff's hip, and that the mental health treatment records pertain primarily to Plaintiff's substance abuse.

Indeed, the ALJ's decision makes it clear that he did not find Plaintiff credible in general.   For example, Plaintiff testified that he last worked at any job in 2017, as a sign language interpreter, and that he stopped working at that job due to hip pain. (Tr. 48, 52). However, the ALJ noted that there was evidence that Plaintiff had continued working after that time, and that the interpreter's job actually ended because Plaintiff's employer learned that Plaintiff had committed a crime. *See*, (Tr. 21) ("There is reason to believe that the claimant again returned to a prior occupation [(concrete mason)] after his suspension as a sign language intereperter."); *see also*, (Tr. 20) ("[M]ental health records document his assertion that he had stopped working as a sign language interpreter because he was suspended once his employers learned about his robbery in Ontario County in March 2017[.]"); (Tr. 23) ("[T]his [interpreter's job] ended for reasons uncounted to his mental or physical impairments.").   Similarly, Plaintiff testified that he had not used illegal drugs since 2016 (Tr. 67), but the ALJ noted that the treatment record showed

8

Plaintiff continually used illegal drugs, including heroin, as late as 2020. (Tr. 23) (referring to Plaintiff's "continued abuse" and "consistent substance abuse."); (Tr. 27) (Referencing treatment note from June 2020 in which Plaintiff admitted recently using "a lot of heroin."). Additionally, Plaintiff testified that he has daily panic attacks (Tr. 73) ("[A]t least once a day."), but the ALJ found no evidence to substantiate that claim: "[T]he record establishes no corroborating evidence of anxiety or panic attacks[.]" (Tr. 25).   Further, Plaintiff testified that he cannot lift his shoulder (Tr. 74), but the ALJ rejected that assertion, stating: "The claimant's testimony regarding inability to raise his shoulder above his ear is not substantiated by the evidence of record." (Tr. 21).

In sum, the ALJ found that many aspects of Plaintiff's testimony were not credible, since they were either contradicted by, or unsupported by, the other evidence of record, including several prior inconsistent statements by Plaintiff to medical providers.

Regarding Plaintiff's hip, the ALJ found that after Plaintiff's first hip surgery in 2016 to repair damage from a motor vehicle accident, Plaintiff essentially recovered well, despite his non-compliance with his doctor's post-operative instructions, and was able to resume working.

The ALJ noted that in early 2017, Plaintiff fell, and imaging showed post-traumatic arthritis in the right hip.   Around that same time, Plaintiff stopped working as an interpreter, due to being fired for his alleged involvement in a crime.   The ALJ observed that in May 2017, Plaintiff began complaining of a hip pain and a limp. Plaintiff subsequently complained of increasing pain, and in August 2017 he had a total right hip replacement.   The ALJ indicated that shortly after this surgery, in or about October 2017,

Plaintiff had two hip dislocations due to his non-compliance with his doctor's instructions. The ALJ found, though, that by November 2017, Plaintiff had essentially recovered from the surgery and was observed ambulating with a steady and brisk gait, with only a mild right-sided limp.

The ALJ indicated that as of March 2018, Plaintiff was complaining of a right-sided limp and pain with exertion, but that he did not follow recommendations to obtain physical therapy.   The ALJ noted that Plaintiff subsequently reported another fall, but that x-rays taken in May 2018 showed no dislocation of Plaintiff's hip prosthesis.   The ALJ noted that in June 2018, Plaintiff had a consultative examination related to his application for SSDI benefits, which Plaintiff attended using a cane.   The ALJ stated that the examiner's report was largely normal, except that Plaintiff walked with a limp and had reduced range of motion in the right hip and 4/5 strength in the right leg. The ALJ observed that in August 2018, Plaintiff complained to his treating doctor of constant pain in the right hip, but that examination showed only a right-sided limp and a restricted range of motion in the right hip.

The ALJ reported that in February 2019, Plaintiff had hip revision surgery of "the femur side only," apparently referring to re-placement of the prosthetic stem in the femur. The ALJ stated that, following this surgery, treatment records indicate that Plaintiff, who was then incarcerated, was largely non-compliant with his doctor's postural- and weight-bearing restrictions, resulting in two hip dislocations which were surgically corrected. The ALJ noted, though, that, "[s]ix weeks postoperatively and despite his dislocations, orthopedic exam revealed only 'mild' pain with hip rotation and no obvious instability." (Tr.

27).

The ALJ reported that Plaintiff subsequently had no additional orthopedic treatment notes until about a year later, in May 2020, when Plaintiff went to the emergency room ("ER") for a hip dislocation. In June 2020, Plaintiff complained of back pain, resulting from sleeping a very long time after using a large quantity of heroin, though diagnostic testing of Plaintiff's spine showed only mild findings. The ALJ stated that Plaintiff returned to the hospital on July 1, 2020, alleging back pain, "though he was ambulating normally without difficulty or complaint and had normal sensation, motor function, and ranges of motion." (Tr. 27). The ALJ noted that in August 2020, Plaintiff went to the ER complaining about his hip, and indicated that his right hip had dislocated again, but that he had managed to put it back in place by himself, and that diagnostic testing and examination had showed normal results, except for gluteal muscle atrophy and guarding upon manipulation of the hip. (Tr. 27-28). The ALJ noted that later in August 2020, Plaintiff had a surgical aspiration of the right hip joint, and planned to have additional surgery for a revision/replacement of the right hip to provide stabilization. (Tr. 28).

Regarding the medical opinion evidence, the ALJ noted that consultative examiner Dr. Isiho ("Isiho") provided a functional assessment in June 2018 that Plaintiff would have "'moderate' restriction for prolonged ambulation, sitting, or standing as well as heavy lifting and carrying," and that he should avoid "all heights, ladders, uneven surfaces, operating heavy machinery, and climbing stairs." (Tr. 28). The ALJ also stated that agency medical consultant A. Periakaruppan, M.D., ("Periakaruppan") opined that the claimant had capacity for a full range of sedentary work. The ALJ indicated that he found

11

both opinions persuasive, but that Ishiho's opinion was more persuasive.   Although, the ALJ did not find Isiho's opinion concerning Plaintiff's ability to ambulate on uneven surfaces persuasive. (Tr. 28) ("I have not found the claimant restricted on rough or uneven surfaces, as opined by Dr. Isihos, as the claimant was not consistently noted to have imbalance, poor coordination, or a slowed gait despite the limp.").

The ALJ also found that Plaintiff did not need a cane or other device, stating: "I have not found he requires use of an ambulatory aid, as it is not demonstrated that one was prescribed outside of his surgical recovery periods or was medically necessary." (Tr. 28).   The ALJ further noted that Plaintiff "often presented to providers without a cane." (Tr. 29).

The ALJ also discussed the multiple opinions of primary care provider Shahabi Momhammadian, M.D. ("Momhammadian"), that Plaintiff was permanently disabled, with no expectation of improvement and no ability to participate in activities except for treatment and rehabilitation.   However, the ALJ found the opinions unpersuasive for various reasons, including that Momhammadian did not treat the hip injury, that she offered no function-by-function analysis, that her notes indicated only that Plaintiff had decreased right hip ranges of motion and a right limp, and that her opinion that Plaintiff was permanently disabled was a matter reserved to the Commissioner. (Tr. 29).

The ALJ also discussed the December 2019 functional assessment of primary care provider Raquel Benchoam-Ravid, M.D. ("Benchoam-Ravid"), which indicated that Plaintiff was "very limited," meaning able to perform for only one or two hours, in his ability to walk, stand, sit, and climb stairs.   The ALJ found the opinion only partially persuasive,

12

observing, in pertinent part, that Benchoam-Ravid's clinical observations concerning

Plainiff's hip functioning were not consistent with those of Plaintiff's orthopedic surgeon:

> Dr. Benchoam-Ravid cited a "severe" limping the right leg, inability to squat
> or walk on heels or toes, "moderate to severe" right hip range of motion
> deficits, and "moderate" decrease in right lower extremity strength, though
> exam findings otherwise within normal limits. I have accounted for the
> claimant's limp, painful or limited hip range of motion, and even additional
> impairments and recurrent dislocations, though the record does not support
> Dr. Benchoam-Ravid's description of "severe" limp, "moderate to severe"
> range of motion deficits, or "moderate" decrease in right lower leg strength.
> The claimant's hip ranges of motion were consistently full or near-full in
> orthopedic and hospital notes with either normal or mildly limping gait, and
> I do not find persuasive her opined greater restrictions than in the residual
> functional capacity. Additionally, she opined the claimant was unable to
> participate in activities except for treatment and rehabilitation, which is not
> persuasive for the same reasons as those cited for Dr. Momhammadian's
> opinions.

(Tr. 29).

Regarding the medical evidence relating to Plaintiff's mental functioning, the ALJ

observed that the treatment records generally pertained to Plaintiff's substance abuse,[8]

and did not support his claims of anxiety and panic attacks.   Mental status examinations

were generally normal. (Tr. 31) (Reporting that "regular psychiatric clinical observations

consistently referenced 'normal' mood, affect, behavior, judgment, and thought content,

cognition, and memory," except on one occasion when Plaintiff seemed anxious.)   The

ALJ further observed that the medical opinion evidence indicated that Plaintiff had "intact

attention, concentration, and memory upon clinical testing with estimated average

---

[8] The ALJ reported that Plaintiff abused drugs consistently when not incarcerated, but that such abuse
did not appear to limit his capacity to work, since, for example, he was able to work as an interpreter
despite his substance abuse. (Tr. 30).

intellectual functioning." (Tr. 31).   The ALJ observed that one examiner opined that Plaintiff had "no limits" in attention and concentration, and mild limits in sustaining an ordinary routine and regular work attendance, while another examiner opined that Plaintiff would have moderate difficulties maintaining attention, concentration, and an ordinary routine, and in completing a normal workday and workweek. (Tr. 31).   The ALJ found that those opinions were "objectively inconsistent with the clinical evidence of record," and noted that despite Plaintiff's "continuing substance abuse and little psychotherapy history," he "was able to successfully work as a sign language interpreter since his alleged onset date until [he was] discharged for legal reasons." (Tr. 32).   Nevertheless, the ALJ limited Plaintiff to "low stress occupations, defined as having simple, routine tasks, basic work-related decisions, and rare changes in workplace setting." (Tr. 32).

The ALJ found that with the RFC noted earlier, Plaintiff could not perform any past relevant work, but that he could perform other jobs existing in significant numbers in the national economy, and that Plaintiff was therefore not disabled.

Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination, making the ALJ's decision the final decision of the Commissioner.

Plaintiff subsequently commenced the instant action, alleging that the Commissioner's decision must be reversed since it contains errors of law and is unsupported by substantial evidence.   In that regard, Plaintiff makes two primary arguments.   First, Plaintiff contends that the ALJ's findings concerning his ability to ambulate are erroneous and unsupported by substantial evidence.   In particular, Plaintiff contends that the ALJ's findings were improperly swayed by the ALJ's mistaken

perception that Plaintiff was consistently noncompliant with treatment recommendations following his hip surgeries:

> The ALJ relies primarily upon his perception of noncompliance throughout the record to find [that] Plaintiff did not meet the requirements of medical listings 1.02 and 1.03, [that] Plaintiff's allegations were not credible, and [that] Plaintiff did not need an assistive device.[9]

Second, Plaintiff contends that the ALJ's RFC finding regarding his ability to stay on task and maintain regular attendance is also erroneous and unsupported by substantial evidence.  More specifically, Plaintiff asserts that the ALJ provided no support for his finding that Plaintiff had the ability, when working, to "remain on task" while switching between standing and sitting, or his finding that Plaintiff could maintain regular attendance at work without accruing too many absences due to further hip dislocations.[10]

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

### The ALJ's Findings Concerning Plaintiff's Ability to Ambulate

Plaintiff maintains that the ALJ improperly drew negative inferences about Plaintiff's ability to ambulate, based on the ALJ's perception that Plaintiff was noncompliant with his orthopedic surgeon's instructions, and that the ALJ consequently erred when making findings about Plaintiff's ability to walk.  However, the Court

---

[9] Pl. Memo of Law, ECF No. 8-1 at p. 15.
[10] Pl. Memo of Law, ECF No. 8-1 at p. 15 ("The ALJ failed to identify evidence supporting the ability to perform full-time work without being off task or absent an impermissible amount.")

disagrees and finds that the ALJ's findings concerning Plaintiff's ability to ambulate were well-supported by evidence unrelated to Plaintiff's noncompliance with treatment recommendations.

To begin with, Plaintiff contends that the ALJ's RFC finding is erroneous and unsupported by substantial evidence insofar as it finds that Plaintiff does not require a cane to walk.   Relatedly, Plaintiff alleges that the ALJ similarly erred when evaluating the credibility of Plaintiff's claim to need a cane while ambulating.   As to these points, Plaintiff asserts that, "[t]he record generally shows that Plaintiff required an assistive device since his second surgery," which occurred on August 30, 2017.[11]   Essentially, Plaintiff argues that he continued to use a cane, therefore the cane was medically necessary for him to use.   Plaintiff cites to treatment notes where doctors reported that Plaintiff was using a cane, but does not cite to any statement from a doctor prescribing the cane or otherwise indicating that Plaintiff could not ambulate effectively without the cane following his post-operative recovery periods.[12]   Rather, Plaintiff faults the ALJ for failing to explain why Plaintiff did *not need* a cane: "[T]he ALJ failed to explain why Plaintiff did not require a cane from the period of May 1, 2017 through February 20, 2019[.]" ECF No. 8-1 at p. 20.

However, putting aside the Defendant's arguments concerning the parties' respective burdens of proof on this point,[13] Plaintiff's position still lacks merit, since the

---

[11] Pl. Memo of Law, ECF No. 8-1 at p. 19.
[12] The record indicates that Plaintiff's surgeons wanted him to use crutches, not a cane, during these post-operative periods.
[13] The burden is on the claimant to prove the extent of his functional limitations, and the claimant's failure to show that he requires a cane to ambulate can by itself provide substantial evidence for the ALJ's RFC determination that the claimant does not need to use a cane. *See, Reyes v. Comm'r of Soc. Sec.*, No. 21 CIV. 372 (AEK), 2022 WL 4482543, at *17 (S.D.N.Y. Sept. 27, 2022) ("While Plaintiff would have the Court conclude that the ALJ should have found that Plaintiff required a cane to stand, there is no medical

ALJ provided good reasons for finding that Plaintiff had failed to show that his cane was medically necessary. *See, e.g.,* Tr. 22 ("During rehabilitating periods post-surgery, the claimant was given ambulatory aids on a short-term basis but there is no evidence to indicate they were prescribed longitudinally."); *see also,* Tr. 26 ("He reported only 'mild' discomfort with right hip range of motion and was able to display a steady and brisk gait, undermining his assertions at hearing regarding reliance upon an ambulatory aid."); *id.* ("He also reported he had been using a cane but there is no evidence that one was actually prescribed for extended use."); Tr. 27 ("The claimant returned on July 1, 2020, alleging back pain, though he was ambulating normally without difficulty or complaint and had normal sensation, motor function, and ranges of motion.").

In sum, in support of his finding that Plaintiff did not need a cane, and that Plaintiff's claim to the contrary was not credible, the ALJ identified substantial evidence unrelated to Plaintiff's noncompliance with treatment. *See, e.g., Ruiz v. Comm'r of Soc. Sec.,* No. 20 CIV. 7638 (GWG), 2022 WL 4076323, at *8 (S.D.N.Y. Sept. 6, 2022) ("While there are some instances in the record where it is noted that Ruiz used a cane, there are also numerous indications in the record — spanning many years — where Ruiz's gait was described as "steady" and where no use of a cane or "assistive device" was noted. In light of this record, we cannot say that the ALJ's determination regarding Ruiz's need for a cane was not supported by substantial evidence.") (internal citation omitted).

---

opinion or other item of evidence in the record that would have supported such a finding. 'A lack of supporting evidence on a matter for which the claimant bears the burden of proof ... can constitute substantial evidence supporting a denial of benefits.' *Barry v. Colvin,* 606 F. App'x 621, 622 (2d Cir. 2015) (summary order); *see Smith v. Berryhill,* 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) (rejecting plaintiff's argument that RFC was deficient where plaintiff "had a duty to prove a more restrictive RFC, and failed to do so").").

Accordingly, Plaintiff's argument on this point lacks merit.

Similarly lacking merit is Plaintiff's contention that the ALJ improperly relied on Plaintiff's supposed noncompliance with treatment to find that Plaintiff did not meet a listed impairment.  In that regard, Plaintiff asserts that he was unable to ambulate for twelve months following his surgery on August 30, 2017, and therefore met listings 1.02 and 1.03, but that the ALJ erroneously found otherwise due to his improper reliance on Plaintiff's alleged noncompliance.   Specifically, Plaintiff states, in pertinent part:

> At step 3 of the sequential evaluation, the ALJ cited to Plaintiff's 'repeated noncompliance adhering to post-operative non-weight bearing restrictions and warnings against sitting at a 90-degree angle during recovery' to find that Plaintiff 'did not display longitudinally consistent imbalance or substantial loss of motor function or reflex.

ECF No. 8-1 at p. 17.

However, Plaintiff's argument on this point is inaccurate.  In that regard, when finding that Plaintiff did not meet a listed impairment due to an inability to ambulate, the ALJ mentioned that Plaintiff "frequently presented with a limping gait," which was "substantially related to his repeated noncompliance adhering to post-operative non-weight bearing restrictions and warnings against sitting at a 90-degree angle during recovery." (Tr. 22).   However, such noncompliance was not the basis for the ALJ's subsequent finding.   Rather, the ALJ stated that, "[e]ven with such limping gait, the claimant did not display longitudinally consistent imbalance or substantial loss of motor function or reflex." (Tr. 22).   As for evidence supporting that finding, the ALJ stated elsewhere in the decision, for example, that on November 9, 2017, Plaintiff was "not using

any assistive device," and "was able to display a steady and brisk gait." (Tr. 26).[14] Additionally, the ALJ noted that on May 9, 2020, "exam findings remained normal and without documented gait disturbance." (Tr. 27).   Further, the ALJ observed that on July 1, 2020, Plaintiff was reported as "ambulating normally without difficulty or complaint and had normal sensation, motor function, and ranges of motion." (Tr. 27). Consequently, the Court finds that Plaintiff's argument concerning the ALJ's step-three finding also lacks merit.

### The ALJ's Findings Concerning Plaintiff's Ability to Maintain Concentration, Persistence, and Pace[15]

Plaintiff contends that the ALJ's RFC finding is erroneous concerning Plaintiff's ability to remain on task while switching from sitting to standing and vice versa, and to maintain attendance at work, given his history of hip dislocations.   More specifically, Plaintiff argues that no medical opinion specifically indicated that Plaintiff would be able to maintain concentration and attention while switching between sitting and standing, and that the ALJ therefore must have relied on his own layman's opinion to create that aspect of the RFC finding out of whole cloth.   Further, Plaintiff contends that since he had a history of frequent hip dislocations, the ALJ should have extrapolated from such information that Plaintiff would likely miss more days of work per month than would be

---

[14] This evidence is clearly inconsistent with Plaintiff's contention that "he did not regain the ability to ambulate effectively within 12 months of his second surgery of August 30, 2017." ECF No. 8-1 at p. 20.
[15] "Appropriate pacing and attendance fall under the category of concentration and persistence." *Rivers v. Kijakazi*, No. 21 CIV. 820 (JCM), 2022 WL 2901578, at *17 (S.D.N.Y. July 22, 2022) (citation and internal quotation marks omitted); *see also, Tina W. v. Comm'r of Soc. Sec.*, No. 5:22-CV-15 (MAD), 2023 WL 157952, at *6 (N.D.N.Y. Jan. 10, 2023) ("The ability to maintain a regular schedule falls under the category of concentration and persistence and thus the ALJ can look to other opinions that examine that issue.") (citation and internal quotation marks omitted).

tolerated by an employer.    However, the Court again disagrees.

Regarding Plaintiff's ability to maintain regular attendance at work, he argues that the ALJ erroneously failed to consider that Plaintiff previously had thirteen hip dislocations, all requiring closed reduction in the emergency room, which suggests that Plaintiff would continue to have similar episodes that would cause him to miss work more frequently than would be tolerated by an employer.    The factual premise of Plaintiff's argument is that he actually had thirteen prior hip dislocations, and, as proof of this, he cites to a treatment note from orthopedist Timothy Wagner, M.D. *See*, Pl. Memo of Law, ECF No. 8-1 at p. 20 ("The most recent treatment notes of Timothy Wagner, M.D. of Orthopedics [sic] indicate that Plaintiff had 13 dislocations since his third surgery as of August 11, 2020, with each requiring closed reduction in the emergency room.") (citing to Tr. 1314).

However, the language to which Plaintiff cites is from the "history" section of Dr. Wagner's "surgery consult note" dated August 11, 2020, which repeatedly indicates that the information therein was provided by Plaintiff. (Tr. 1314) ("per his history . . . he reports that . . . he does report a past history . . . he also reports").    Moreover, the ALJ methodically reviewed the medical evidence and noted only *six* documented hip dislocations, and this finding is supported by substantial evidence. (Tr. 26-27). [16] Accordingly, the factual premise of Plaintiff's argument is not supported by the record. Besides that, Plaintiff's contention that future hip dislocations would prevent him from

---

[16] Additionally, the ALJ noted another instance in which Plaintiff went to the ER claiming that he had sustained a dislocation and had put the hip joint back in place by himself, but "radiographs showed no dislocation and his examination revealed normal hip ranges of motion." (Tr. 27).

working is entirely speculative.   On the other hand, the ALJ cited evidence indicating that the hip dislocations generally occurred when Plaintiff disregarded his orthopedic surgeon's instructions.   The Court therefore finds that Plaintiff's argument on this point lacks merit.

Lastly, Plaintiff maintains that the ALJ's RFC finding, regarding Plaintiff's need to alternate between sitting and standing, and Plaintiff's ability to remain on task, is erroneous and not supported by substantial evidence.   Plaintiff essentially contends that the only way the RFC finding could be properly supported is if a medical source expressly stated both that Plaintiff needed to frequently change position and that Plaintiff had the ability to maintain attention and concentration while changing from a sitting position to a standing position and vice versa.[17]   However, the Court again disagrees.

"Although an ALJ's opinion 'need not perfectly match any single medical opinion in the record,' it must nevertheless be supported by substantial evidence." *Rucker v. Kijakazi*, 48 F.4th 86, 91 (2d Cir. 2022) (*quoting Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022)).   Here, the RFC finding does not match any single medical opinion, but it is based on substantial evidence.   For example, there is evidence that Plaintiff's ability to maintain attention and concentration was intact,[18] and no opinion indicated that Plaintiff's ability in that area was seriously limited.   Accordingly, the ALJ's finding that Plaintiff would be able to maintain attention and concentration while changing positions was not

---

[17] *See*, Plaintiff's Reply Brief, ECF No. 10 at p. 1 ("[T]he record does not contain a medical opinion indicating that Plaintiff could perform sedentary work with the ability to alternate between sitting and standing at will but must remain on task during the sit/stand period.   [An] ALJ cannot create findings out of whole cloth.") (citation and internal quotation marks omitted).

[18] The ALJ noted, for example, that consultative psychiatric examiner Dr. Deneen found Plaintiff to have "intact" attention and concentration. (Tr. 31).

"arbitrary" or based solely on the ALJ's "surmise," contrary to what Plaintiff maintains. Similarly, Plaintiff objects that the ALJ did not explain how Plaintiff could perform the sitting required by sedentary work and did not cite "any evidence to formulate the sit/stand finding."[19]   However, the Court finds that the ALJ's rationale is apparent from his decision overall and is supported by substantial evidence.   Plaintiff, on the other hand, has not persuasively shown that a factfinder would be required to find that he is more limited than what the ALJ found.   Consequently, the Court denies Plaintiff's argument on this point.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 9) for the same relief is granted.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        March 31 , 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

[19] Plaintiff's Reply Brief, ECF No. 10 at pp. 4-5.